UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MAGNA MIRRORS OF AMERICA,**

    Plaintiff and
    Counter-Defendant,

v

    Case No: 07-10688
    Honorable Victoria A. Roberts

**3M COMPANY,**

    Defendant and
    Counter-Plaintiff.

_____/

## ORDER REGARDING MOTIONS
## (DOC #S:  185, 186, 187, 188, 189, 195, 198, and 236)

**I.  INTRODUCTION**

Magna Mirrors of America ("Magna") filed a one Count Complaint alleging that 3M Company's ("3M") adhesives infringe on its 5,587,236 patent ("'236 patent").  Magna's '236 patent covers an "autoclave" (American, low heat process) method for attaching mirrors to windshields using a structural adhesive. "Structural adhesive" means "a non-elastomeric adhesive (i.e., not an elastic adhesive resembling rubber) . . . ."  *Magna Donnelly Corp. v. 3M Co.*, No. 07-cv-10688, 2012 U.S. Dist. LEXIS 100238 (E.D. Mich., July 19, 2012) (adopting Magistrate Judge's Report and Recommendation of claim construction); *Magna Donnelly Corp. v. 3M Co.*, No. 07-cv-10688, 2012 U.S. Dist. LEXIS 100242 (E.D. Mich., June 15, 2012) (Magistrate Judge's Report and Recommendation).

Magna's Answer alleges eight affirmative defenses and three counterclaims, the counterclaims are:

    1. Non-infringement of the '236 patent;

1

    2. Invalidity of the '236 patent; and

    3. Unenforceability of the '236 patent due to Magna's inequitable conduct.

Among the motions pending now before the Court are cross-motions for summary judgment on 3M's equitable estoppel and laches defenses, as well as Magna's motion for summary judgment on 3M Company's ("3M") lack of standing defense. The Court heard oral argument on these motions on June 4, 2013.

The parties inundated the Court with thousands of documents. However, the attempt to broaden the issues and complicate the case is unavailing; the dispositive issues of equitable estoppel and laches are not complex.

Further, Magna's attempts to deceive the Court with arguments wholly unsupported, or controverted by objective evidence, as well as deceptive affidavits, are troubling.

Equity bars this action. When Magna's '236 patent issued in 1996, Magna knew or should have known of 3M's alleged infringement. Instead of investigating 3M's activities or enforcing its patent, Magna promoted 3M's alleged infringing adhesive to suppliers. Because of this misleading behavior which 3M relied on and is prejudiced by, the defense of equitable estoppel is established.

Magna's motion for summary judgment is **DENIED IN PART**; Magna has standing to bring this suit, but it is equitably estopped from pursuing it; the remaining issues raised by Magna are **MOOT**. 3M's motion to dismiss based on equitable estoppel and laches is **GRANTED;** 3M's counterclaims are dismissed without prejudice as MOOT, as is the balance of 3M's motion. This case is **DISMISSED**.

## II.    BACKGROUND

Magna is one of the largest sellers of automobile mirrors for windshields. Magna also

sells mirror buttons used to attach mirrors to windshields. Magna's most profitable button is the "camlock" button; it can only be used with a Magna mirror.

3M is in the business of selling adhesives. Magna sells its mirror buttons to 3M, and 3M attaches its adhesive to the buttons. 3M then sells the mirror button system to windshield manufacturers which attach the mirror button system to windshields. They sell the assembly to an "automobile manufacturer" ("OEM"). Finally, the OEM attaches a Magna rearview mirror to the now windshield-mounted button.

As the size and weight of rearview mirrors increased over the years, adhesives applied using the autoclave process were not strong enough; Magna's mirrors fell off of windshields. Warranty claims caused Magna to initiate attempts to develop an adhesive that would hold its mirrors. Magna employee James K. Galer was aware that a 3M adhesive (AF-42) was used in Europe for this purpose, but he wanted an epoxy adhesive with a lower curing temperature. He saw publications describing use of 3M-made low curing temperature structural adhesives for metal-to-metal applications in the aerospace industry, and called 3M to request a sample. Magna's initial tests of that AF-163-2 sample were encouraging.

Thereafter, on October 9, 1991, Magna employees, Raj K. Agrawal, Niall R. Lynam, and Mr. Galer, filed their initial '236 patent application. At that time, Dr. Lynam was Manager of Applied Research, and in 1992, he became Vice President of Corporate Research and Development ("R&D"); Dr. Agrawal and Mr. Galer were scientists within Dr. Lynam's R&D group. The claimed invention required a system having a laminated windshield, a mirror mounting button, a structural adhesive, an epoxy resin and latent hardener comprised within the structural adhesive. The patent also called for the structural adhesive to cure in an autoclave process. 3M's AF-163-2 was disclosed as the patentee's preferred adhesive.

Magna's further testing of the AF-163-2 testing was unsuccessful, and on October 30, 1991, Magna approached 3M for assistance. The two companies entered into an agreement to develop a non-elastic epoxy adhesive that would hold Magna's heavy mirrors and mirror button system to windshields, as well as cure in the autoclave process. Magna did not inform 3M that it sought to patent what would be their prospective collective work.

Within a year, Magna explained the inter-workings of its mirror button system and the autoclave process to 3M; and, 3M provided Magna with samples of three different kinds of its non-elastic epoxy adhesives. While Magna achieved good adhesion in the laboratory, the 3M adhesives did not perform well; when applied using the autoclave process -- the adhesives either did not cure, or they did not hold Magna's heavy mirror to the windshield.

In 1992, 3M began exploring chemistry apart from its collective work with Magna; it discovered the Sumitomo 3M epoxy-acrylic hybrid tape from its Japanese franchise. And, 3M -- without Magna's knowledge -- tested its Sumitomo 3M epoxy-acrylic hybrid tapes for adhesion in the autoclave process.

The Sumitomo 3M epoxy-acrylic hybrid tapes were a success. These tapes are the structural bonding tape adhesives ("SBTs") (9214, 9263, and 9270) that are still used in 3M's mirror button bonding application; they are at issue in this case. Each adhesive has the same chemical composition but differs in thickness. In 1997, 3M filed a patent for this adhesive; 3M's patent was granted in February, 2002.

Shortly after 3M began testing the Sumitomo tapes, Magna made a request for payment from 3M for 3M's own earlier adhesives that it provided to Magna. 3M declined to pay, saying it would not pay Magna for its own product. In December, 1992, Magna requested payment in the form of royalties; 3M again declined to pay. On February 1, 1993, Magna accepted that 3M

4

would not pay Magna royalties or proceeds.

The next day, 3M wrote Magna to terminate its contractual relationship. 3M told Magna that it was investigating something new in mirror bonding technology: the Sumitomo tapes. On February 9, 1993, 3M told Magna it would disclose the chemical composition of its new adhesive, if Magna would provide it with a new confidentiality agreement and not require proceeds from the sale of its adhesives. The parties entered into a new contract and resumed their earlier relationship.

The new agreement did not restrict 3M's ability to supply adhesives or adhesive tape products to other customers. However, a clause in the 1993 agreement restricted Magna from testing the samples for a year.

Within weeks of entering into the second agreement, 3M provided the sample SBTs and their respective Material Safety Data Sheets ("MSDSs") to Magna. The MSDSs disclose the composition of the SBTs. Since then, Magna sold and continues to sells its mirror buttons to 3M with the intent that 3M attach its SBTs to the button.

On December 24, 1996, the United States Patent and Trademark Office ("USPTO") issued Magna's '236 patent. There is no dispute Magna did not disclose its patent or patent application to 3M; 3M discovered Magna's patent through 3M's own search in February, 1997.

In 1998, Magna offered 3M a license to the '236 patent; 3M declined. Magna says that in 2001, it began to suspect 3M of infringement, so in 2002, it made a second license offer to 3M; 3M did not respond. In 2003 and 2005, Dr. Lynam asked the 3M employee at the Magna location who serviced the 3M and Magna account, why 3M did not respond to the 2002 license offer; nothing developed from this conversation. Dr. Lynam testifies that he confirmed his suspicion of 3M's patent infringement by looking at 3M's SBTs' MSDSs online in 2003/2004.

In July, 2005, following a business meeting between Magna and 3M, Magna issued 3M a letter alleging patent infringement; this lawsuit was filed in 2007.

### III.  STANDARD OF REVIEW

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir.2005). "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir.2011).

When reviewing cross-motions for summary judgment, the court must assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005). The facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A fact is material for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

### IV.  ANALYSIS

#### A.  Jurisdiction

First and foremost, standing must be addressed. *Fieldturf, Inc. v. Southwest Rec. Indus.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004) (citing *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)). "To bring an action for patent infringement, a party must

be either the patentee, a successor in title to the patentee, or an exclusive licensee of the patent at issue." *Id.* "A purported exclusive licensee must show that he possesses all substantial rights' in the patent." *Id.* Under 35 U.S.C. _ 100(d), "[t]he word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee." *Id.*

While documentation shows that Magna Donnelly holds an exclusive license to the patent, 3M argues Magna does not have standing because Magna cannot account for all of Magna's name changes.

Magna provides reliable documentation for each of its name changes. On October 8, 1991, the inventors assigned their entire right, title and interest to Donnelly Corporation. The assignment agreement says "Assignor hereby sells, assigns and transfers unto said Assignee the full and exclusive right, title and interest to the said invention in the United States and in all foreign countries and the entire right, title and interest in and to any and all Letters Patent which may be granted therefore in the United States . . . ." A USPTO record says that on January 13, 2003, Donnelly Corporation changed its name to Magna Donnelly Corporation. This lawsuit was filed on February 15, 2007 in the name of Magna Donnelly Corporation. Magna submits a certificate of amendment to its article of incorporation which says that on January 31, 2003, Magna Donnelly Corporation changed its name to Magna Mirrors of America. Magna timely amended its complaint to accurately reflect its name.

Magna has standing to bring this action.

### B. Patent Infringement

#### 1. Equitable Estoppel

Despite years of promoting 3M's adhesive, Magna now says that 3M's SBTs contributorily infringe claims 20-24, 27-36, 38-44, and 46-47 of the '236 patent. 3M counters,

and argues that Magna's claim is barred by the doctrines of laches and equitable estoppel.

"Equitable estoppel . . . is a [complete] defense to a claim for Patent infringement." *Nartron Corp. v. Borg Indak, Inc.*, 848 F. Supp. 2d 725, 749 (E.D. Mich. 2012)(citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). And, it has three elements that must be proven by a preponderance of the evidence:

> The [Patentee], who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. (2) The [alleged infringer] relies on that conduct. (3) And the [alleged infringer] would be harmed materially if the [Patentee] is later permitted to assert any claim inconsistent with his earlier conduct.

*A.C. Aukerman Co.*, 960 F.2d at 1041.

Equitable estoppel and laches share the elements of knowledge and prejudice. Proof of equitable estoppel, however, also requires proof that a plaintiff has engaged in misleading conduct, and that a defendant relied on such conduct to its prejudice. *Id.* Additionally, unlike laches, where a six-year delay creates a presumption of prejudice, there is no minimum delay period for equitable estoppel to bar a claim. *Id.*

### i. Knowledge and Misleading Conduct

"Estoppel requires representations or conduct by the patentee from which the alleged infringer could reasonably infer that the patentee had abandoned his claim." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 879 (Fed. Cir. 1991).

Magna does not dispute that it promoted and encouraged the sale of 3M's adhesives. Nor does Magna dispute that promoting and encouraging the sale of an alleged infringing product is misleading to the alleged infringer. Instead, Magna's fundamental opposition to the application of equitable estoppel is that it had insufficient knowledge of 3M's infringement until the 2003/2004 time period, because: (1) it was actively misled by 3M concerning the composition of

3M's infringing adhesive (i.e., Magna says 3M led it to believe that the adhesive was acrylic rather than epoxy based), and (2) the only Magna employees who knew that the 3M adhesive was epoxy-based had no responsibility for patent enforcement, or lacked knowledge of the existence of the '236 patent. Magna relies on agency principles which it says preclude imputation of knowledge to Magna.

### a. Magna Knew That 3M's Adhesive Was an Epoxy

Magna argues that it cannot be charged with knowledge because Dr. Lynam was never actually told by 3M that its adhesive was an epoxy. Magna is mistaken.

Either actual or constructive knowledge of the infringing activity (even without knowledge that the activity is an infringement) is sufficient to put a patentee on notice. *Id.* ("[D]elay begins when the plaintiff knew, or in the exercise of reasonable diligence should have known, of the defendant's allegedly infringing activity.") To put a patentee on constructive knowledge, an infringer's activities must be "pervasive, open, and notorious." *See Hall v. Aqua Queen Mfg., Inc*., 93 F.3d 1548, 1553, 39 U.S.P.Q.2d 1925, 1928 (Fed.Cir.1996); see also *Wanlass v General Electric*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998) (constructive knowledge where defendant sold and marketed allegedly infringing products through print advertisements and trade shows).

Magna says that since it is not in the business of selling adhesives, any constructive knowledge that it may have had, was not sufficient to place it on notice. This, too, is a flawed argument. While Magna may not be in the business of selling adhesives, the mirror button and adhesive businesses are intertwined and -- there is no dispute -- simply knowing that 3M's adhesive was an epoxy was sufficient to put Magna on notice that 3M's adhesives potentially infringed. The record is replete with evidence illustrating Magna's constructive knowledge,

9

from 1993 to the present.

Over the years, 3M reported that its SBTs were acrylic modified epoxy tapes:

(1) In 1993, 3M gave Magna samples of the new SBT technology known as NPE 8246. Raj Agrawal, a '236 patentee wrote, to Doug Smith at 3M, saying:

> Donnelly recommended primer B-47 for improving adhesion of NPE-8246 tape (acrylic modified epoxy tape) to glass will no longer be available for future use. Our primer supplier has discontinued this product and is recommending primer B-421 as a replacement. We suffice that 3M should evaluate and validate this new primer _B-421". Please let me know if you need a sample of the primer B-421[;]

(2) Magna employee Ken Mally, wrote a November, 1994 Ford report which describes 3M's adhesive as an epoxy;

(3) In 1994, 3M sent samples of its SBTs to a scientist at Magna;

(4) In January, 1995, 3M produced a promotional Product Description Sheet for its SBT calling it a "modified epoxy chemistry;"

(5) Magna produced – from its own records – 3M's MSDS dated January, 1997, which lists its SBT as "[m]odified epoxy chemistry;"

(6) In 1996, 3M publishes that its adhesive is a "modified acrylic;" and

(7) In 2000, 3M sent the 1998 MSDS of its SBT (listing epoxy resin as an ingredient) to a Magna scientist, Dr. Damin Hall.

Clearly, Magna had constructive, if not actual knowledge, of 3M's alleged infringement.

Assuming *arguendo* that the law required 3M to actually inform Dr. Lynam that its adhesive was an epoxy, 3M would have met its burden: ample evidence shows that twice 3M directly informed Dr. Lynam that its adhesive was an acrylic epoxy. For example, in April, 1993, 3M delivered samples of its SBTs to Magna. 3M says the SBTs' MSDSs were delivered

with the samples; Dr. Lynam signed the confirmation of receipt which says that Magna is to see MSDS for hazardous handling. At the hearing, 3M says its MSDSs have always described its SBTs as epoxy acrylates. Magna does not dispute the descriptions in the MSDSs.

      Secondly, an email sent to Magna employee Philip March by 3M on April 24, 2000, says:

> Phillip - Attached is the PowerPoint presentation that I promised to send to you for your review with Niall Lynam. It is a general overview of our Structural Bonding Tapes (SBT) for attaching rearview mirrors, and I have included some of the durability and image stability information that we shared with Steve Barth and yourself last month.

Philip March's email to Dr. Lynam date April 30, 2000, says "I now have the information about the following adhesives: a. SBT- Structural Bonding Tape - 3 M Tape - Epoxy." Dr. Lynam was informed that 3M's adhesive was an epoxy in 1993 and again informed of the SBTs' composition in 2000.

      Further evidence of Magna's knowledge is contained within various patent applications. Several patent applications Dr. Lynam submitted to the USPTO -- which say that 3M's adhesives were epoxies -- unequivocally establish that Dr. Lynam knew 3M's adhesives were acrylic epoxies:

      (1) Provisional patent application filed on September 21, 2000, describing a preferred adhesive for attaching windshield mounting buttons as "a structural adhesive such as a modified epoxy structural bonding tape available from 3M of Minneapolis-St. Paul, MN under the trade names SBT 9214, SBT 9263 and SBT 9270;"

      (2) Patent application filed on November 10, 2000, describes a preferred adhesive for attaching windshield mounting buttons as "a structural adhesive such as a modified epoxy structural bonding tape available from 3M of Minneapolis-St. Paul, MN under the trade names SBT 9214, SBT 9263 and SBT 9270." This application later issued as a patent; and

11

(3) Patent application filed February 26, 2001, describing a preferred adhesive for attaching windshield mounting buttons as "a structural adhesive such as a modified epoxy structural bonding tape available from 3M of Minneapolis-St. Paul, MN under the trade names SBT 9214, SBT 9263 and SBT 9270."

Magna cannot now argue that Dr. Lynam did not know or believe that 3M's adhesives were epoxies until 2000. However, Dr. Lynam presents conflicting evidence concerning his knowledge and suspicions. His deposition testimony was that he began to think that 3M's adhesive infringed sometime in 2002:

> As I said, in 1998, I had no reason to believe they infringed. By 2002- I wrote to them. In 1999- I'm sorry, in 2002, I began to have some doubts. I mentioned the Ken Mally where he described it now as an acrylic epoxy, and then I saw it around that time described as modified epoxy chemistry, and, you know, I wrote to 3M. I didn't hear back from them. It kind of went out of my mind. In 2002, I was very busy in the takeover of Donnelly by Magna that occurred in October of 2002. 3M came back to my mind. Oh, I think some time in 2003, a nice gentleman called Mr. Ray Wood came in. For whatever reason, and I cannot remember exactly the reason, I ended up looking at these MSDS sheets [sic] and it occurred to me, bingo, and so in 2004 I acted differently than I did in 2002 and 1999.

But, Dr. Lynam's affidavit says "I was not aware that 3M's SBTs infringed until the 2003/2004 timeframe."

Contemporaneous documentary evidence, quoted above, contradicts both versions of Dr. Lynam's sworn testimony. At the Court's summary judgment hearing, Magna conceded that Dr. Lynam knew or should have known of the alleged infringement in 2000. No reasonable juror would believe Dr. Lynam did not think 3M's adhesives infringed until 2003/2004.

In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court held "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment." *Id.* at 380. In *Harris*, a *video* recording "clearly contradict[ed]" the plaintiff's version of the facts, and the Supreme Court disregarded the plaintiff's testimony. *Id.* at 378.

Similarly, this Court will rely upon the other evidence outlined above -- rather than Dr. Lynam's contradictory sworn testimony.

No genuine dispute exists: Raj Agrawal and Dr. Lynam as patentees and people who had an obligation to enforce Magna's patent knew 3M's adhesive was an epoxy, and their knowledge is imputed to Magna. *U.S. Philips Corp. v. ATI Tech., Inc.*, 05CIV.8176(LAP), 2008 WL2073928, *2 (S.D.N.Y. May 8, 2008)(Ex. 1) (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir. 1959))(it must be shown that the agent had "some duties to perform on behalf of the principal with respect to the transaction, although the agent need not have acquired his knowledge in connection with those duties.").

### b. Magna Had a Duty to Investigate

After conceding at the summary judgment motion hearing that Dr. Lynam had knowledge of potential infringement in 2000, Magna argued for the first time that it did not have a duty to investigate 3M's potential infringement or file a lawsuit alleging infringement. Alternatively, Magna argued that it fulfilled its duty to investigate by speaking with 3M -- the alleged infringer -- about infringement in the late 1990s and was not obligated to either test the adhesives or view the adhesives' MSDSs online. Magna is wrong.

Although Magna may not have had a duty to allege infringement, at the very least, it did have a duty to investigate 3M's known activities, with which it was very familiar, to determine if there was infringement. *See Wanlass v General Electric*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998)("sales, marketing, publication, or public use of a product similar to or embodying

technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement."). This duty, however, did not arise until issuance of the patent in 1996.

In the face of the actual and constructive knowledge possessed by Magna, it cannot reasonably claim that it satisfied its duty to investigate by speaking with 3M, and allegedly being misled by 3M's descriptions of its SBTs. No evidence confirms that Magna and 3M discussed infringement in the 1990s. To the contrary, undisputed evidence shows that Magna and 3M did not discuss infringement until 2005. And, contrary to Magna's argument, the parties' communications detail that 3M told Magna its adhesive was an epoxy.

### c. Magna Misleads 3M

Magna had knowledge of potential infringement. But, rather than investigate or allege infringement after obtaining sufficient knowledge of infringement, Magna promoted 3M's adhesive.

Before the Magna patent issued, Magna encouraged the development of 3M's adhesive. In September, 1993, Magna evaluated 3M's adhesive for bond strength improvement. In December, 1994, patentee Raj Agrawal wrote to Dr. Lynam and said that 3M's adhesive was a success.

Additionally, prior to the issuance of the Magna patent, Magna made a demand for payment from 3M for adhesives Magna thought were covered under its patent. 3M twice refused payment, and Magna stopped asking. 3M then disclosed the contents of its SBTs and resumed its relationship with Magna. Since Magna ceased to demand payment, it was reasonable for 3M to assume that it would not seek payment later.

Even after Magna's patent issued, Magna continued to encourage the development and sale of 3M's adhesives. One month after Magna's patent issued, Magna began selling its camlock mirror buttons to 3M with the intent that 3M apply its SBTs. In September, 1997, Magna began testing 3M's adhesive for performance stability with its mirror button; this testing continued until 1999. In 2000, Magna recommended 3M's adhesive to Mitsubishi. In 2000, Magna partnered with 3M to solve a problem with its heavy OnStar mirrors.

Additionally, after Magna's patent issued, rather than demand payment, Magna sent 3M a license offer in 1998 and 2002. 3M rejected the first offer and did not respond to the second. Magna remained silent and continued to promote 3M's adhesive. Indeed, to date, Magna continues to sell its mirror buttons to 3M with the intent that 3M apply its adhesive to the button. Magna's silence and license offers inform the Court's analysis; they corroborate Magna's acquiescence to non-payment.

Magna's conduct prior to the issuance of its patent, coupled with its conduct after its patent issued, was misleading. This reasonably led 3M to believe that Magna did not intend to enforce its patent against it. "Estoppel requires representations or conduct by the patentee from which the alleged infringer could reasonably infer that the patentee had abandoned his claim." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 879 (Fed. Cir. 1991). This criterion is satisfied.

    ii.  **Reliance**

Magna addresses what it says is evidence of 3M's non- reliance on Magna's alleged misleading behavior in one sentence of its thirty-one page brief in support of its motion for partial summary judgment, and in one paragraph of its thirty page brief in opposition to 3M's motion for summary judgment. Magna simply says 3M did not rely on its misleading behavior.

But at the hearing -- and without citing authority-- Magna argued that its primary claim in opposition to 3M's equitable estoppel defense is that 3M did not rely on Magna's encouragement; Magna says 3M cannot establish reliance because it never stopped selling SBTs.

Magna's underdeveloped argument is waived. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004)("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put the flesh on the bones.) (citations and internal quotations omitted).

Even if this argument were not waived, it would be unpersuasive. "To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with" its allegedly infringing conduct. *A.C. Aukerman Co.*, 960 F.2d at 1043.

The mere fact that 3M continued to sell and invest in its SBTs establishes reliance. *See Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509, 514 (D.N.J. 1990)(finding that continued capital investments in a business area is sufficient to establish reliance and prejudice).

### iii. Prejudice

A defendant must show that it suffered material prejudice, either economic or "evidentiary," as a result of the plaintiff's delay. *Aukerman*, 960 F.2d at 1033. "Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1032.

Under the doctrine of laches, prejudice is presumed where there is a six-year delay. Since 1996, there has been an eleven year delay and since 2000, a seven year delay. 3M is entitled to a presumption of prejudice, and Magna does not rebut it.

Beyond the presumption of prejudice, 3M establishes economic prejudice. Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.* "Making heavy capital investment and increasing production can constitute prejudice." *Adelberg Laboratories, Inc.*, 921 F.2d at 1272; see also *Technology for Energy Corp. v. Computational Systems, Inc.*, No. 92 1542, 92 1551, 1993 U.S. App. LEXIS 24556, *21 (finding economic prejudice where defendant expanded its business, including employees, sales, and research and development).

3M's expert opines that, accounting for inflation, 3M spent 18 million in SBT investments. Magna does not dispute that 3M is prejudiced by its investment; rather, Magna says this testimony is inadmissible because experts cannot testify to prejudice. But, Magna's attempt to discredit 3M's accounting expert misses the mark. 3M's accounting expert simply provides the Court with an overview of the amount of money that 3M spent on SBT investments. This testimony is admissible and can be relied upon by the fact finder in determining prejudice.

Even if there was no economic prejudice, evidentiary prejudice exists. 3M sufficiently shows that key witnesses now rely upon faded memories; relevant documents from 1993-2000 are nearly non-existent. And, there is no dispute: Magna did not issue a litigation hold on documents until 2011. A reasonable juror could find that 3M suffered evidentiary prejudice.

3M would be severely prejudiced if Magna were allowed to proceed; the defenses of equitable estoppel and laches are established.

### 2. Unclean Hands

To defeat 3M's equitable defenses, Magna -- without explanation -- says 3M has unclean hands. While this argument only consists of one paragraph in its response to 3M's motion for summary judgment, Magna argued to the Court at the hearing that 3M deliberately told Magna that its adhesive was an acrylic and defrauded Magna into entering into the parties' second agreement, all in an effort to conceal the true composition of 3M's SBTs and stall an infringement action. Magna's argument is not persuasive.

As discussed above, 3M did not conceal that its adhesive was an epoxy. Several Magna employees, including patentees Dr. Lynam and Raj Ackwal, were told that 3M's adhesive was an acrylic epoxy.

A party seeking to invoke equity must have acted fairly and without fraud or deceit as to the controversy in issue. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). And, the doctrine of 'unclean hands' applies to cases of an exceptional character, such as where a defendant was responsible for plaintiff's delay or affirmatively allayed the plaintiff's suspicions through deception. *Bound v. Spencer Gifts, Inc.*, No. Civ. A. 95-2216, 1996 WL 556657, at *4 (E.D. Pa. 1996).

There was no fraud by 3M in negotiating the second agreement. Undisputed evidence shows the negotiated *quid pro quo* for the second contract was that 3M would disclose the composition of its SBTs for a new confidentiality agreement. 3M's termination letter says 3M was terminating the relationship because under the then agreement, 3M did not have a right to its own confidential information. A week later, 3M told Magna it would disclose the chemical composition of its new adhesive, if Magna would provide it with a new confidentiality agreement. The parties entered into a new contract and resumed their initial relationship.

And, while the second agreement restricted Magna from testing the adhesives for one year, 3M provided Magna with a copy of the SBTs' MSDSs. As agreed, 3M adequately disclosed the composition of its adhesives.

Magna's unclean hands argument fails.

### IV. CONCLUSION

Magna's motion for summary judgment is **DENIED IN PART**; Magna has standing to bring this suit, but it is barred by the doctrines of equitable estoppel and laches. The remaining issues raised by Magna are **MOOT**. 3M's motion to dismiss based on equitable estoppel and laches is **GRANTED;** 3M's counterclaims are dismissed without prejudice as **MOOT**, as is the balance of 3M's motion. This case is **DISMISSED**.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: June 14, 2013

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on June 14, 2013.

s/Linda Vertriest
Deputy Clerk

19